UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

|                          |   |                   |
|--------------------------|---|-------------------|
|                          | ) |                   |
|                          | ) |                   |
|                          | ) | No. 3:08-MC-04    |
| IN RE: JAMES A. H. BELL  | ) | (Shirley)         |
|                          | ) |                   |
|                          | ) |                   |
|                          | ) |                   |

## O R D E R

This matter arises from Attorney James A. H. Bell's course of conduct during his representation of a criminal defendant, Johnny Martin, before this Court in <u>United States v. Briddy</u>, et al., No. 3:07-CR-51. This matter is before the Court on the issue of Mr. Bell's alleged criminal contempt during his representation of Mr. Martin and particularly with regard to his written filing and oral representations concerning the basis for his Motion to Dismiss for Prosecutorial Misconduct [Doc. 252]. A brief statement of the nature of that case is necessary to place the events and conduct at issue here in a logical context. Although the underlying criminal case is extensive, the Court will endeavor to include only those matters pertinent to the issues before the Court as to Mr. Bell in this proceeding.

### NATURE OF THE CASE

On May 4, 2007, Johnnie Martin and several other people were arrested by federal law enforcement agents and charged with serious crimes involving the alleged distribution of substantial amounts of drugs, firearms offenses, and related criminal conduct. Attorney Dennis Francis was appointed to represent Johnnie Martin. That relationship deteriorated, however, and, on July 23, 2007, the Court conducted a hearing on the issue and Attorney Francis' request to withdraw was

granted.  Pursuant to the practice of this Court, a new lawyer was present in the event it may be necessary to appoint replacement counsel, in this case Attorney James A. H. Bell.

*July 23, 2007 Hearing*

At the July 23, 2007 hearing, a discussion was had on the record concerning Mr. Bell's willingness to accept representation and with regard to whether or not he foresaw any potential conflict of interest issues.  Assistant United States Attorney David Jennings described in general terms the nature of the case and its relationship to another pending criminal conspiracy case, United States v. Cofer, et al, No. 3:07-CR-37.  Mr. Bell stated that after Joe Cofer was charged, he had met with Mr. Bell.  Mr. Bell stated that the meeting was about Mr. Cofer's indictment in United States v. Cofer, but that Mr. Cofer did not engage Mr. Bell for his defense.  Although the Court does not wish to belabor each remark made during the course of these events, the heart of these proceedings lies with statements made by Mr. Bell, and reference directly to the transcripts is the most accurate means to relate what was said.  The transcript of the July 23, 2007 hearing, filed later as document 278[1] in the original case, records the following:

The Court: Mr. Bell, would you be willing to accept appointment in this case?

Mr. Bell: Yes, Your Honor. Good afternoon.

The Court: Good afternoon. Have you had  an opportunity to speak with Mr. Martin and to look at the file in a cursory manner?

Mr. Bell: Cursory. With, of course, for the record, with Mr. Francis' permission since he was his client.

---

[1]Unless otherwise noted, all citations to the record refer to documents filed in United States v. Briddy, No. 3:07-CR-51.

2

<u>The Court</u>: Right. You understand enough about it to feel like you don't have any conflicts or anything that would cause you to end up being, having to withdraw in the near future or anything?

<u>Mr. Bell</u>: I don't think so. Let me ask the government. Any of these people I have represented in the past? He [indicating Mr. Jennings] told me I was like an octopus, my tentacles go far and wide.

<u>The Court</u>:  I understand that. I want to be sure it is conflict-free counsel, as best as I can appoint it.

<u>Mr. Jennings</u>:  I hadn't thought about that until you raised the question, Your Honor. There is a connection between Mr. Bell, a tenuous connection between Mr. Bell and this case in a way in that this case started with, as I have said many times, with a wiretap of some individuals' phones by the name of Cofer. Years ago, years ago Mr. Bell represented one of the Cofers that went to a jury trial that I prosecuted in state court, as a matter of fact, back in the late eighties or early nineties. I don't remember the year exactly now. For the record, even though Joe Cofer's phone was tapped as a part of this investigation, I don't know of a direct connection between Joe Cofer and this defendant and his organization. Joe Cofer's brother Boone Cofer, James D. Cofer, that was the first phone we tapped. As I have said before, it was sort of a domino effect in place here of tapping his phone which led to the tapping of Tony Manning's [charged as a co-conspirator to Mr. Martin] phone which led to the tap of the two phones being used by Tavares Smith and Johnnie Martin in this particular conspiracy.

<u>Mr. Bell</u>: Let me address that a little further. Your Honor, when Mr. Cofer was initially arrested on this case, he came to see me. I called Mr. Jennings and found out what kind of case they had on him. I just told, Brother Cofer, I said, it wouldn't be, it would be an exercise in futility to pay me the money I would require to be here on this case given what David Jennings told me. I think because of that I elected not to get into Mr. Cofer's case because I didn't think I could help him. It is what it is. I mean, I have always represented Joe Cofer and have not ever represented Boon[e]. There was two different trials in Knox County when he was the prosecutor in the state court I had with Mr. Cofer. I think he was acquitted on one and the jury hung on the other or something like that. I can't remember.

<u>The Court</u>:  If I remember what Mr. Jennings told me last time this situation presented itself where we were changing an attorney, there wasn't a real expectation on the part of the government that Joe Cofer would be testifying in this case.

<u>Mr. Jennings</u>: That is still my belief, Your Honor. Now, James D. Cofer or Boon[e], as he is known, will be testifying as this case is currently postured since Mr. Manning is still in the indictment. It was just one of those things where investigation of A led to investigation of B.

<u>Mr. Bell</u>: I am perfectly willing. I am just being candid with the Court.

<u>The Court</u>: As usual I would like you to look at that early on because if it is going to be a conflict and it is going to result in any kind of recusal down the road, Mr. Martin will want to know that as soon as possible and the Court will want to know that as soon as possible because he is entitled have conflict-free counsel.

<u>Mr. Bell</u>: I understand. May I have a moment to talk to him about that?

<u>The Court</u>: Sure.

<u>Mr. Bell</u>: This gentleman [indicating Mr. Martin] says, Your Honor, Mr. Martin says that that is not a problem. I have disclosed that.

<u>The Court</u>: Based on what everybody knows at this point and what the Court has been advised of it is not at the point where I think it is a problem either. If it should turn out that anything else is disclosed, and you will, of course, want to keep Mr. Martin advised of that if either you or Mr. Martin should have any concerns about any type of a conflict. I want to be made known, I want to be made aware of that just as soon as possible.

<u>Mr. Bell</u>: Sure. I am willing to stay here and labor in the vineyards of justice.

<u>The Court</u>: All right.

\*\*\*

[Trans., Doc. 278, pp. 4 - 8]

Thereafter, as no indication was made by Mr. Bell of any type of conflict, the issue was not revisited, and Mr. Bell continued to represent Mr. Martin through the litigation of pretrial motions over the next several months. However, on February 5, 2008, more than six months after the July appointment hearing and three weeks before trial, Mr. Bell filed a Motion to Dismiss for Prosecutorial Misconduct [Doc. 252] and a Motion to Withdraw [Doc. 254]. The government

4

responded on the following day.[2]  Because of the jury trial scheduled to commence on February 26, 2008, both motions were immediately heard on February 7, 2008.

*February 7, 2008 Hearing*

As a part of his Motion to Dismiss for Prosecutorial Misconduct [Doc. 252], Mr. Bell asserted that he had personally met with Mr. Joe Cofer regarding representation in United States v. Cofer, et al.  This meeting was integral to one of Mr. Bell's principal arguments: that Mr. Jennings knew Mr. Bell had met with Mr. Cofer regarding that drug conspiracy and knew that Mr. Cofer must be called as a witness by Mr. Martin at trial (even if the government did not intend to call Mr. Cofer); and, alternatively, that Mr. Jennings should have known these facts and that his lack of diligence had worked such prejudice to Mr. Martin as to amount to prosecutorial misconduct.  Mr. Bell presented a defense theory that, he argued, would unquestionably require Mr. Cofer to testify for Mr. Martin.

Mr. Bell proffered that this defense would be that Mr. Martin was a member of the United States v. Cofer drug conspiracy and not the United States v. Briddy conspiracy, with an element of mistaken audio identification.[3]  Without repeating Mr. Bell's entire argument, the crux of the matter became the representation as fact that Mr. Bell had interviewed Mr. Cofer at his law office regarding prospective representation, as noted above, and at that time had learned information subject to the

_____

[2] Ultimately, fourteen documents were filed by the parties on various aspects of this issue, with at least eight supporting exhibits and attachments.

[3] The defense theory here is merely roughly identified because its specificity was not further revealed and the specifics do not relate directly to the issues before the Court in this action.

5

attorney-client privilege. Mr. Bell argued that the confidences related by Mr. Cofer *during that meeting* now created a conflict of interest because they related to the same subject matter as Mr. Martin's case.[4] Mr. Bell attributed awareness of this attorney-client relationship to the fact that he telephoned Mr. Jennings while Mr. Cofer was in his office in order to gather some information about the government's case, relating the circumstances of his inquiry during the call. Among other arguments in opposition to his motion, the government argued that no confidential attorney-client communication about the case could have occurred between Mr. Cofer and Mr. Bell in the attorney's office because after Mr. Cofer's arrest on his current charge, he was detained pending trial. Mr. Bell contradicted this contention by adding detail to support both the truth of his statements and the accuracy of his recollection.

---

[4] Mr. Bell also argued that his representation of Mr. Cofer in the late 1980's created a conflict of interest if Mr. Cofer were called as a witness as Mr. Bell had now come to anticipate. The Tennessee Rules of Professional Conduct treat present and former clients differently for purposes of loyalty conflict. Rule 1.7 Conflict of Interest: General Rule provides: "(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents in writing after consultation." In contrast, Rule 1.9 Conflict of Interest: Former Client provides: "(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client, unless the former client consents in writing after consultation." (Emphasis added). As the record reflects that Mr. Martin was born in 1975, it seems unlikely that this indictment could be characterized as "the same or a substantially related matter" to Mr. Cofer's late 1980's state charge. Furthermore, as set out later in this opinion, when questioned about this issue, Mr. Bell's answer was that the Court had "missed the point," which was the alleged recent meeting with Mr. Cofer. Accordingly, the argument to be considered was based in Rule 1.7. Subsequent developments in the case made this particular issue moot, however, and the Court did not render an opinion on Mr. Bell's asserted conflict of interest.

With the purpose of persuading the Court to believe he did meet with Mr. Cofer and to dismiss the indictment against Mr. Martin, Mr. Bell made the following statements in opposition to the government's contention Mr. Cofer was in custody:

> Mr. Bell: Your Honor, the non-confidential communication that I had with Mr. Cofer when Mr. Jennings says Mr. Cofer was in jail, Mr. Cofer was in my office dressed in a plaid shirt. We talked about his graying hair, how much weight he had put on, talked about his kids -- One of his children from Alabama was with him. His child from -- His girlfriend from Alabama was with him. We talked about his business down here on Western Avenue, his clothing store, all in a non-confidential communication. And they left and Joe stayed and we talked. Now, if this happened before he went to jail or after he went to jail, I don't know. Or if the DEA has run him up here, I don't know. Maybe he was cooperating. Maybe he wasn't. I don't know. But he was in my office. He was wearing brand new tennis shoes. He was wearing creased blue jeans. He was wearing his leather brown belt. And I remember it. And I called David Jennings.
>
> The Court: I'm having a hard time reconciling that. I don't know where you're going after that, but --
>
> Mr. Bell: Well, he just said that he was in jail and wasn't there. And that's not true.
>
> The Court: Well, you understand the problem? He was arrested.
>
> Mr. Bell: Well --
>
> The Court: He comes to Court. He's held in –
>
> Mr. Bell: Then the only other conclusion is that the DEA got him out of jail and brought him -- sent him up to my office with a wire. And they've done that before in this District.
>
> The Court: Well, that's, that's what I'm trying to figure out because it appears that he has been in custody from the time he was arrested.
>
> Mr. Bell: Ask Mr. Jennings.
>
> Mr. Jennings: Judge, I just said I didn't understand it because I -- I was --
>
> The Court: Was he in custody the whole time?

<u>Mr. Jennings</u>: Judge, I was in his house when he was arrested.

<u>The Court</u>: Right.

<u>Mr. Jennings</u>: And he was taken to jail that night. And I do not think --

<u>The Court</u>: And was the conversation with Mr. Bell after that?

<u>Mr. Jennings</u>: I don't know.

<u>The Court</u>: Okay. Well --

<u>Mr. Jennings</u>: I don't know. I didn't make a note of --

<u>The Court</u>: -- here we've got --

<u>Mr. Jennings</u>: -- that phone call.

<u>The Court</u>: -- the whole issue -- Just one second. The whole issue involves a confidential relationship with Mr. Joe Cofer. We're here on the eve of trial in this really big matter and I've got two really fine attorneys on this seminal issue -- forget everything else we've talked about for three hours -- and you don't even know when you met with Mr. Cofer, when you had this conversation that's so vital you have to protect it at the risk of turning in your own name. Good luck with the Board of Professional Responsibility when you tell them, "I met with this guy, I don't know when, I don't know why, I don't know about what." Okay?

<u>Mr. Bell</u>: You want my letter?

<u>The Court</u>: Pardon?

<u>Mr. Bell</u>: You want my letter?

<u>The Court</u>: No, I'm telling you what you've told me. And I don't know if you've told them something different.

<u>Mr. Bell</u>: No.

<u>The Court</u>: But you don't know when you met with Mr. Cofer –

<u>Mr. Bell</u>: I didn't say that.

<u>The Court</u>: -- or when you spoke with Mr. Jennings.

8

<u>Mr. Bell</u>: I've not -- I did not go back and get my calendar out or get my chart out and look.

<u>The Court</u>: Well, what I'm saying is, I hope you appreciate that a Judge who sits here and detains somebody and they remain detained, when somebody comes in and says, "I met with them outside the office" --

<u>Mr. Bell</u>: I met with him in --

<u>The Court</u>: -- "after that" --

<u>Mr. Bell</u>: -- in the office.

<u>The Court</u>: Met with them outside the custodial place --

<u>Mr. Bell</u>: Yes.

<u>The Court</u>: -- where I placed them --

<u>Mr. Bell</u>: Yes.

<u>The Court</u>: -- that certainly causes my antenna to go up.

<u>Mr. Bell</u>: Well --

<u>The Court</u>: I guess everybody I put in custody I think is sitting out there in Blount County or in Knox County. But if I accept what you've said, somehow he appeared in your office.

<u>Mr. Bell</u>: With his girlfriend from Alabama and with his --

<u>The Court</u>: With his girlfriend --

<u>Mr. Bell</u>: -- and I think his three year old child.

<u>The Court</u>: -- dressed as you have described him --

<u>Mr. Bell</u>: Right. Because Joe's got a number of children and they range from -- like mine, from little ones to big ones.

<u>The Court</u>: And you had this conversation with Mr. Jennings about --

<u>Mr. Bell</u>: Mr. Cofer.

9

The Court: -- about this charge --

Mr. Bell: Yes.

The Court: -- and, and what it -- what was all involved and what you said.

Mr. Bell: And David told me he had him wrapped tighter than --

The Court: Well, I don't know what -- I don't really know what all to make of that right now. All right. What else do you say?

Mr. Bell: You've heard enough.

[Trans., Doc. 263, pp. 78 - 83]

Faced with this contradiction, the Court recessed the hearing for one week, until February 14, 2008, for the purpose of resolving this factual issue. The Court directed the attorneys as follows:

> The Court: And here's what I want. Mr. Bell, you have tendered to me in writing and orally that you met with Mr. Cofer with regard to the indictment issued against him in his case. You called Mr. Jennings. I would like you to check your records and see if you can determine when you actually met with him. And I'd like -- Mr. Jennings, I know you said you don't keep copious notes and whatever -- Anything you can check that might jog in your memory or cause you to now know when you had that conversation with Mr. Bell, I should like to know that as best you can.

[Trans., Doc. 263, p. 90]

In the days that followed, several documents were filed related to the issues before the Court. A brief statement of the nature of these filings is necessary for consideration of the manner in which the problem persisted and was exacerbated.

On February 8, 2008, Attorney Bell filed Notice of Efforts to Comply With Directives of This Court [Doc. 256] which contained the following statements about the meeting with Mr. Cofer: "As for this Court's third directive, counsel has reviewed certain business records. An affidavit will follow. As with this Court's second directive, counsel is seeking Board approval before filing."

10

[Doc. 256 at ¶ 6]. Later on February 8, 2008, Attorney Bell filed a Second Notice of Efforts to Comply With Directives of This Court [Doc. 258], relating a telephone conversation he had with a representative of the Board of Professional responsibility as to whether the facts gave rise to an ethical conflict, again assuming the meeting with Mr. Cofer.

Also on February 8, 2008, AUSA Jennings filed a Response to Court Order of February 7, 2008, [Doc. 257] reporting that, "Likewise, a review of the calendar of the undersigned has shed no light on determining the date this telephone conversation took place." [Doc. 257 at 2]. On the next business day, February 11, 2008, the government filed a Supplemental Response [Doc. 259] with two attachments. The first attachment was an affidavit executed by Bethel Poston, an agent with the DEA who was the "case agent in charge of an investigation which led to the arrest of Joseph L. Cofer." Agent Poston's affidavit relates that he was present at Mr. Cofer's arrest at 9:00 p.m. on Thursday, March 29, 2007. Agent Poston's affidavit goes on to describe in detail Mr. Cofer's arrest, his transport to the Knox County Detention Facility, and, the following morning, to the federal courthouse where Mr. Cofer made his initial appearance before the undersigned. Agent Poston states that he was present in the courtroom during Mr. Cofer's initial appearance and heard the Court order the defendant's detention. [Doc. 259-2]. The second attachment was an affidavit signed by United States Marshal Charles Pittman. Marshal Pittman described his duties with regard to federal prisoners in this district and stated that, "Cofer came into the custody of the U.S. Marshal Service on March 30, 2007, after his initial appearance in federal court that day. He has never been released on bond, and has remained in continuous custody to the current date." [Doc. 259-3].

Later the same day, the government filed a Second Supplemental Response, [Doc. 261], with one exhibit, a statement signed by Joseph Cofer on February 11, 2008, and witnessed by his

11

attorney. Mr. Cofer denied visiting the office of, or even speaking with, Mr. Bell in March or April of 2007. [Doc. 261-2 at ¶11 and ¶12]. Mr. Cofer's statement also reports that: "I have not had any communications or dealings with members of Mr. Bell's firm, including associates or paralegals, relating to my current federal indictment or since he stopped representing me in the 1980s." [Doc. 261-2 at ¶ 9].

On February 12, 2008, Attorney Bell filed a Third Notice of Efforts to Comply With Directives of This Court [Doc. 262], reporting that the Board of Professional Responsibility had informed Attorney Bell that he had an ethical conflict in representing Mr. Martin whether or not he met with Mr. Cofer as described. [Doc. 262 at ¶ 4].

The next relevant filing was made later on February 12, 2008, Attorney Bell's Notice of Compliance With Directives of This Court (Final) [Doc. 266] with two exhibits. Although Attorney Bell had previously reported that he had " reviewed certain business records" on the issue, his Notice [Doc. 266] *reiterated* (the word used by Attorney Bell) his complaint against AUSA Jennings and the purported basis for dismissal of the indictment against Mr. Martin [Doc. 266 at ¶ (b)(2)]. Further, the Notice seemingly diluted Attorney Bell's asserted contact with Mr. Cofer in light of the statement and affidavits, but he declined to specifically acknowledge any mistake or error, instead still asserting: "the undersigned can only express to this Court that the undersigned truly *believes* that the undersigned met with Mr. Cofer. If this belief is untrue, it results from a sincere and severe confusion and mistake on the part of the undersigned." [Doc. 266 at ¶ (c)(1)(B)]. The document goes on to say that Attorney Bell's office records show that he met with supporters of Mr. Cofer in his office on April 2, 2007. [Doc. 266 at ¶ (c)(1)(F)].

*February 14, 2008 Hearing*

On February 14, 2008, the Court reconvened the hearing on the Motion to Dismiss for Prosecutorial Misconduct [Doc. 252] and the Motion to Withdraw [Doc. 254]. After argument was heard from the government, Attorney Bell again (and despite the government's filing of affidavits clearly refuting his contentions) continued to assert the merits of his Motion to Dismiss grounded in the misconduct of AUSA Jennings, whom he alleged was well-aware of Attorney Bell's meeting with Mr. Cofer about the 3:07-CR-37 case. Mr. Bell even called the government to task in a commentary about the responsibilities of prosecution:

> <u>Mr. Bell</u>: I'm not going to argue the motion any further except to say the record is what it is, I've offered my explanation, I stand on it, [AUSA Steve Cook] can make of it whatever he wants to, and if justice in this country means that every time a stand up comes in on behalf of the citizen accused runs the risk of going to jail then, you know, looks like I'm their boy. I would like to point out from Burger versus United States 295 U.S. 78 something that Mr. Cook said. United States Attorney as a representative not of the ordinary party to a controversy but of a sovereignty his obligation to govern impartially is as compelling as its own -- and the Government and whose interest, therefore, in a criminal prosecution is not that it shall win a case but that justice shall be done. As such, he is in a peculiar and very definite sense to serve another law. The twofold angle which is that guilt shall not escape or innocence suffer. He may prosecute with honestly and vigor and indeed he should do so, but while he may strike hard blows he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use other legitimate means to bring about adjustment. In this case, Your Honor, the Government has conceded that my Motion to Withdraw is a valid one. The language in the Motion to Withdraw mirrors essentially the same language that's in the Motion for Prosecutorial Misconduct.

[Trans., Doc. 272]

At the conclusion of the argument, the Court denied the motion to dismiss based on a finding that there was no prosecutorial misconduct. [Doc. 269] The Court did grant the motion to withdraw and permitted Attorney Bell to withdraw from the case at that time, in part because of these

developments, his statements that he would be ineffective counsel, and his proffer that the Board of Professional Responsibility had opined that he had a conflict irrespective of whether he recently met with Mr. Cofer.

## CONTEMPT OF COURT

### *Notice and Procedure*

On February 14, 2008, after concluding the proceedings as to Mr. Martin's case and excusing those defendants, the Court, based on the appearance that Mr. Bell had misrepresented and fabricated his meeting with Joe Cofer, gave notice to Attorney Bell that he would be held to show cause why he should not be held in contempt of court for misbehavior committed in the presence of the Court with the intention to obstruct justice. A hearing was set on that matter for March 24, 2008, at 1:30 p.m.[5] Attorney Bell is represented in this case by Attorney Donald Samuel, of the Georgia bar, and Knoxville Attorney Morris Kizer. On March 10, 2008, the Court conducted a pre-hearing telephone conference at the request of Attorney Samuel and AUSA Cook. In that telephone conference, the Court confirmed the government's understanding that it is not a party to these proceedings and the Office of the United States Attorney was excused from attendance, thus concluding their participation in these events. Attorney Samuel stated that he would be ready to proceed on the previously selected date for the hearing.

---

[5] Attorney Bell's withdrawal from Mr. Martin's defense ultimately resulted in Mr. Martin choosing to proceed to trial pro se, and a severance for trial from the other defendants. Mr. Martin's week-long trial ended in a guilty verdict on one count, and no verdict on the remaining counts. Beginning March 30, 2009, Mr. Martin was re-tried on the unresolved counts. During the second trial, Mr. Martin was represented by new counsel, and he was convicted on seven of the eight previously unresolved counts.

14

During the March 10, 2008 telephone conference, the Court informed Attorney Samuel that the matter would go forward as a summary criminal contempt proceeding, governed by Federal Rule of Criminal Procedure 42(b) and 28 U.S.C. § 636(e), but with additional due process extended to Attorney Bell beyond that associated with a summary proceeding. The Court described this as a "summary plus" proceeding by stating the essential facts constituting the charged criminal contempt, allowing for adequate notice of the time and place of the hearing, giving reasonable time to prepare a defense, and providing an opportunity to present evidence and argument and to be represented by counsel. Attorney Samuel agreed that this was an appropriate and fair procedure. [3:08-MC-4, Doc. 6. at p. 7] Attorney Samuel further informed the Court that Attorney Bell would not be contesting the falsity of the statements he made to the Court about his meeting with Mr. Cofer. Attorney Bell, through counsel, agreed that the statements were untrue in advance of the hearing and wished to proceed only on the issue of penalty.

*The Law*

Congress has provided power and authority to federal courts to punish contempt (18 U.S.C. § 403) and has expressly established and provided contempt authority to U.S. Magistrate Judges per 28 U.S.C. § 636(e).

> (e) <u>Contempt authority</u>
>
> (1) <u>In general</u> - A United States Magistrate Judge . . . shall have . . . the power to exercise contempt authority as set forth in this section.
>
> (2) <u>Summary criminal contempt authority</u>.--A magistrate judge shall have the power to punish summarily by fine or imprisonment, or both, such contempt of the authority of such magistrate judge constituting misbehavior of any person in the magistrate judge's presence so as to obstruct the administration of justice. The order of

contempt shall be issued under the Federal Rules of Criminal Procedure.

28 U.S.C. § 636(e)(1)-(2).

The applicable Federal Rule of Criminal Procedure is Rule 42 Criminal Contempt. Governed by the Federal Rules of Criminal procedure, the Court observes that Rule 42 addresses "summary" criminal contempt as follows:

> (b) <u>Summary Disposition</u>. Notwithstanding any other provision of these rules, the Court (other than a magistrate judge) may summarily punish a person who commits criminal contempt in its presence if the judge saw or heard the contemptuous conduct and so certifies; a magistrate judge may summarily punish a person as provided in 28 U.S.C. § 636(e).

Fed. R. Crim. P. 42(b).

The penalties for criminal contempt "shall not exceed the penalties for a Class C misdemeanor as set forth in Section 3581(b)(8) and 3571(b)(6) of Title 18." 28 U.S.C. § 636(e)(5). The maximum penalties for such a Class C misdemeanor are not more than thirty days imprisonment and a fine of not more than $5,000. 18 U.S.C. § 3571(b)(6).[6]


*March 24, 2008 Contempt Hearing*

The contempt matter was tried before the Court, without a jury, on March 24, 2008. Attorney Samuel and Attorney Kizer submitted a Pre-Hearing Memorandum [3:08-MC-4, Doc. 6] on behalf of Attorney Bell, which the Court has reviewed both before the hearing and during the

---

[6]Alternatively, the statute provides: "the act committed in the magistrate judge's presence may, in the opinion of the magistrate judge, constitute a serious criminal contempt punishable by penalties exceeding those" for a Class C misdemeanor, in which case the Court should certify the facts to the District Court for further proceedings. 28 U.S.C. § 636(e)(6)(B). The undersigned does not find that this matter falls within 28 U.S.C. § 636(c)(6)(B).

16

time this matter has been under advisement. Attorney Bell made a statement and apology at the hearing and both of his counsel presented argument in mitigation of his conduct and potential punishment. Attorney Bell's position was essentially that while the statements about the meeting were not true, he did not intentionally misrepresent or fabricate the meeting. The matter was taken under advisement at that time.

*Delay in Ruling*

The Court feels it is important to explain why this matter has remained under advisement since the March 24, 2008, hearing.[7] As previously noted herein, following the February 2008 hearings, Defendant Johnny Martin proceeded to trial, as scheduled, on February 26, 2008, which resulted in a guilty verdict on one count and no verdicts returned on the remaining counts. Mr. Martin's case was reset for trial and continued several more times. Beginning March 30, 2009, Mr. Martin was re-tried on the unresolved counts, resulting in a conviction on seven of the eight previously unresolved counts.

Because Mr. Bell's contempt proceedings were publicized, because Mr. Bell had proffered that one of Mr. Martin's defenses would be an admission that he was a member of a different drug conspiracy than that charged in the indictment, and because the Court did not know what strategy Mr. Martin and/or his subsequently appointed counsel would pursue at trial, the Court was concerned that any additional and/or recent publicity regarding the proffered defense could

---

[7] This explanation has previously been given orally to Mr. Bell and the government, neither of whom objected.

potentially prejudice defendant Martin, particularly if he chose not to pursue that defense.[8]  Because

the proffer of the defense theory was germane and material to the defendant's motion to dismiss for

prosecutorial misconduct, it would necessarily need to be a part of the Court's opinion and is

addressed herein.  Given that any publicity resulting from the Court's ruling on Mr. Bell's contempt

of court charge could likely have included the representations by Mr. Bell and because such could

have been potentially prejudicial to Defendant Martin, the Court has retained this matter under

advisement pending the conclusion of Mr. Martin's trials.  Additionally, two of the co-defendants

in Mr. Martin's Indictment had implied that their cases were intertwined with Mr. Martin's, and they

opted to continue their trials until after Mr. Martin's trial was concluded.  Because of similar

concerns regarding potential prejudice to their cases, the Court awaited the conclusion of their trials

set for  June 2009.


### FINDINGS OF THE COURT

The Court starts with the proposition that Mr. Bell's repeated statements of fact to the Court

during a hearing on February 7, 2008, were not true.  More specifically, Mr. Bell's repeated

statements that he had personally met with Mr. Joe Cofer in the Spring of 2007 and established a

confidential attorney-client relationship with him at that time were not true, were in fact false, and

were misrepresentations of the true facts.  Mr. Bell now admits and concedes the same.

Based on the pre-hearing Memorandum filed on behalf of Mr. Bell [3:08-MC-4, Doc. 6] and

the arguments and testimony at the hearing on March 24, 2008, Mr. Bell's arguments against a

finding of contempt of court are essentially these:

---

[8]The Court understands that Mr. Martin did not pursue the proffered defense at trial.

1) Mr. Bell's false statements to the Court in February 2008, that he personally met with Joe Cofer in the Spring of 2007 following Mr. Joe Cofer's arrest:

> a) while admittedly false, and a misrepresentation of fact, were simply erroneous, based on a flawed memory and a mistaken belief and were an honest mistake. Bell did not intentionally, willfully, or knowingly make the misrepresentation;

> b) did not actually or materially obstruct the business of the Court; and

> c) must be shown to have been knowingly and intentionally made by proof beyond a reasonable doubt.

Mr. Bell argues that to be found in contempt, the Court would need to find that:

> 1) Mr. Bell was not simply mistaken about his meeting with Mr. Cofer, but intentionally misrepresented facts to the Court;

> 2) Proof of Mr. Bell's intent must be found beyond a reasonable doubt; and

> 3) The false statement was material and obstructed the business of the Court.[9]

[3:08-MC-4, Doc. 6, p. 7-8] Defendant's proposal closely comports with the law in the Sixth Circuit as summarized in a recent unpublished opinion <u>United States v. Rickey Martin</u>.

> Rule 42(b) of the Federal Rules of Criminal Procedure says that a court "may summarily punish a person who commits criminal contempt in its presence if the judge saw or heard the contemptuous conduct and so certifies." The contempt power "rests on the need to maintain order and a deliberative atmosphere in the courtroom," and should be exercised when "an open, serious threat to orderly procedure [requires] instant and summary punishment . . . to fill the need for immediate penal vindication of the dignity of the court." To

---

[9]The defendant also argues that the Court would need to make a fourth finding, that an alternative contempt provision found at 18 U.S.C. § 401(2) does not apply to lawyers because they are not "officers of the court" within the meaning of that statute. The Court is not proceeding under this statute and, accordingly, makes no finding with regard to its applicability to lawyers.

> sustain a summary-contempt conviction, we generally require a four-part showing: (1) the defendant's conduct must constitute "misbehavior," (2) "the misbehavior must amount to an obstruction of the administration of justice," (3) the conduct must take place in the presence of the court and (4) the defendant must have the "intent to obstruct."

United States v. Martin, 251 Fed. App'x. 979, 981 (6th Cir. 2007). This statement mirrors the magistrate judge contempt authority at 28 U.S.C. § 636(e)(2).

Taking the defendant's arguments into account, as well as what the Sixth Circuit and 28 U.S.C. § 636(e)(2) state the Court must find, the issues to be determined are whether 1) Mr. Bell's conduct constituted "misbehavior"; 2) this misbehavior took place in the presence of the Court; 3) this misbehavior amounted to a material obstruction of the administration of justice and the business of the Court; and 4) the proof established beyond a reasonable doubt, that Mr. Bell's misrepresentations were made knowingly, intentionally, and willfully and with the intent to obstruct, or whether the proof established it was simply an honest mistake based on a flawed memory and/or mistaken belief. It does not appear to the Court that Mr. Bell contests either of the first two issues, (i.e., that his conduct constituted misbehavior and occurred in the presence of the Court). In case there be any doubt, however, the Court hereby certifies that the statements in issue, were made in the presence of the Court, and the Court further finds that Mr. Bell's misrepresentations, which he now admits, constitute "misbehavior." The Court perceives Mr. Bell's arguments to be with regard to the last two issues, as follows: 1) the admitted misrepresentations were made mistakenly verses intentionally, and 2) these statements and his conduct didn't materially obstruct the business of the Court or the administration of justice.

*Mistaken Belief Versus "Intent to Obstruct"*

Mr. Bell asserts in support of the "honest mistake-flawed memory - mistaken belief" claim the following arguments:

> 1) Bell made the same statement based on the same mistaken belief in July 2007 at the time he was appointed as substitute counsel, evidencing his confusion at an earlier time when there was no reason to mislead the court.

> 2) In the "heat of the litigation" it is not unusual for lawyers to err in recollections and "stray from the truth."

> 3) Bell wouldn't methodically and intentionally construe a fabricated meeting with Joe Cofer," because such an erroneous fact was "easily refutable"

> 4) When his faulty memory was brought to his attention Mr. Bell readily acknowledged his mistake (citing Doc. 266, ¶ C).

> 5) Mr. Bell's past history, record as an attorney, and reputation belie any contention that he would knowingly and intentionally lie to the Court.

In reviewing the transcript of the hearing held on July 23, 2007, it does appear that in the appointment process of appointing Mr. Bell to represent defendant Johnny Martin, the Court inquired of Mr. Bell if he had any conflicts that would cause him to withdraw in the near future, and that AUSA Jennings noted this case began with wiretaps of phones of persons named Cofer including Joe Cofer. He also noted Mr. Bell had represented one of the Cofers (admittedly Joe) back in the 1980's or early 1990's. Mr. Jennings went on to say that despite that fact, he knew of no direct connection between Joe Cofer and the defendant or his alleged organization in this Indictment. Mr. Bell did indicate at that time, that "when Mr. Cofer was initially arrested on the case, he came to see me." Mr. Bell went on to state he had called AUSA Jennings regarding Mr. Cofer's Indictment (in a separate case) and based on that conversation he decided not to represent Joe Cofer. AUSA Jennings repeated an earlier stated position that Joe Cofer would not be called as a witness by the

21

government in Mr. Martin's case, but James Cofer (Boone) would likely testify. After consulting with Mr. Martin, Mr. Bell stated that was not a problem. The Court admonished Mr. Bell twice "to look at that early on, because if it is going to be a conflict and it is going to result in any recusal down the road" both Mr. Martin and the Court would want to know that "as soon as possible," and to make the Court aware of that as soon as possible. No such notice was given for six months, and the motions at issue were filed just weeks before trial.

The Court readily acknowledges on July 23, 2007, Mr. Bell made a similar misrepresentation, namely that he had met with Mr. Joe Cofer after he was initially arrested, and the Court acknowledges that that one simple statement, arguably made when he was unprepared to address the alleged "Joe Cofer conflict" issue (since it came up suddenly) could well have been made as the result of an erroneous belief or flawed memory at the time. However, in light of the fact that his prior client was mentioned specifically, and this issue specifically discussed, coupled with the Court's specific admonition to look into the issue of whether a potential conflict involving Joe Cofer might arise, such facts belie the proffered notion that an earlier flawed memory or honest mistake would be support for Bell's subsequent repeated assertions, made with great specificity and stringent argument over six (6) months later. [See Docs. 252, ¶ 12; 254, ¶ 11]

Furthermore, Bell's subsequent filing of two (2) motions made the claim of a meeting with Joe Cofer and Joe Cofer's inquiry of counsel (Bell) to represent him in the recent indictment of Cofer at case No. 3:07-CR-37. By presenting this argument in these pleadings, Mr. Bell essentially

certified that he had made reasonable inquiry to assure these factual contentions were accurate and supported by evidence.[10]

At a minimum, before making such an allegation in support of the motion, the Court would reasonably expect any attorney to have taken some steps to ensure its accuracy. This would be particularly true of Mr. Bell in this case, in light of the earlier discussion and the Court's specific admonition to look into the issue of any "Joe Cofer conflict." Moreover, because it formed the basis for the motion to dismiss and alleged that another attorney (herein AUSA Jennings) was guilty of prosecutorial misconduct, the onus on ensuring accuracy was heightened. It appears clear that no effort was made to verify the accuracy or truth of this claim, because the efforts this Court asked Mr. Bell to take (i.e., checking his calendar, records, and his staff), as well as the simple act of calling Mr. Joe Cofer or his attorney or his family would have confirmed the falsity of the alleged representations at that time.

Furthermore, unlike the single isolated statement made in July 2007, Mr. Bell persisted during the motion hearing on February 7, 2008, on insisting and reiterating the misrepresentation that he personally met with Mr. Joe Cofer following his arrest in 2007. By way of examples: Mr. Bell stated falsely Mr. Joe Cofer came by to see him pursuant to an appointment, that they met and discussed the case, and that they had confidential communications [Trans., p. 8]. He averred he was "so far entrenched" in the Cofer matter, "that it compromised his attorney/client relationship with

---

[10]While not holding that Rule 11 of the Federal Rules of Civil Procedure apply to criminal filings, there seems to be no good reason for not expecting a similar duty on attorney filings in criminal cases.

Mr. Martin." [Trans., p. 8]. He then elaborated on the phone call to Mr. Jennings and on the generic advice he allegedly gave Mr. Cofer [Trans., p. 9].[11]

Mr. Bell continued to argue, with greater specificity, that such meeting did occur by elaborating that "it was a confidential communication between me and Mr. Cofer. At some point another family member was there, which removed it from the confidential communication. Mr. Cofer was present when I called Mr. Jennings. That fact was made known to Mr. Jennings." [Trans., p. 41-42]

Mr. Bell went on to state that in his opinion the fact that someone (i.e., Joe Cofer) even sees a lawyer is a confidential communication that shouldn't be disclosed. [Trans., p. 42] When the Court noted he had now disclosed that fact, he stated he was going to have to self report himself to the Board of Professional Responsibility.[12] [Trans., p. 43] He further claimed he had continuously had a professional relationship with Mr. Cofer since the 1980's. [Trans., p. 55]

---

[11]The Court also questioned Mr. Bell regarding his alleged conflict as it related to his representation of Mr. Joe Cofer twenty years ago and how he could claim that conflict was "intuitively obvious." The Court explained it was having trouble seeing how his representation of Cofer, that long ago, could constitute a conflict twenty years later [Trans., p. 41] Mr. Bell's answer was not to explain how that could be–rather his answer was that the Court "had missed the point." Specifically, he stated: "You missed my point. When he got indicted on this case. I had a confidential communication with him. And I called Mr. Jennings." [Trans., p. 41] Thus, the "point" of the conflict according to Mr. Bell, was not his representation of Mr. Joe Cofer twenty years ago but rather his alleged meeting and alleged confidential communication with Mr. Cofer in 2007. The statement that the Court had "missed the point" was not intended, nor taken, as any sign of disrespect toward the Court or this Judge but rather was intended to focus in on the actual basis for the motion, i.e., the recent meeting with Joe Cofer and resulting confidential communications.

[12]The Court has no way of knowing if this self report was made, but if it was, the Court assumes that in light of the falsity of the underlying fact, i.e. that he actually met with Mr. Cofer, that he would not be in violation of disclosing a confidential communication that never occurred.

24

Later when Mr. Jennings argued against the motions, and particularly the motion for prosecutorial misconduct he specifically took issue with Mr. Bell's assertion that he did meet with Mr. Joe Cofer. He noted that Mr. Cofer had been in jail since the night of his arrest and had not been released since that night [Trans., p. 63] He further elaborated that in the phone call with Mr. Bell, he was told by Mr. Bell "Joe Cofer came by to see me," but Mr. Jennings stated he did not see how that could be, as Joe Cofer was in jail [Trans., p. 66], had never gotten out of jail, and was still there. [Trans., p.67]

In response to Mr. Jennings specific challenge to the accuracy of Mr. Bell's earlier representations regarding his meeting with Mr. Cofer, it is important to note Mr. Bell did not argue to the effect "well that's how I remember it," or "I could be mistaken, but it's my belief he was there." Nor did Mr. Bell argue in words that would indicate his earlier representations might be based on a faulty memory or a mistaken belief that he did in fact meet with Mr. Cofer "when Mr. Jennings says Mr. Cofer was in jail." [Trans., p. 78] Rather, to the contrary, and in an apparent effort to convince the Court of the accuracy and correctness of both his allegation and memory, he elaborated with great specificity, "Mr. Cofer was in my office dressed in a plaid shirt. We talked about his graying hair, how much weight he'd put on, talked about his kids - - one of his children from Alabama was with him. His child from - - his girlfriend from Alabama was with him. We talked about his business down on Western Avenue, his clothing store, all in a non-confidential communication and they left and Joe stayed and talked." [Trans., p. 79] It is noteworthy that at this point, Mr. Bell was obviously trying to bolster both his credibility and his memory on this disputed issue, both of which had been challenged by Mr. Jennings. He did so by asserting to the Court how

good his memory of that meeting really was, down to the specifics of the clothes Mr. Joe Cofer was wearing and the exact nature and extent of their conversations.

To now contend that these statements and arguments were based on a faulty memory or mistaken belief as to Mr. Cofer's presence, not only belies the argument above, but tends to make the above argument even more egregious. It's one thing to argue "I was mistaken" regarding Mr. Cofer's presence, but to essentially "make up" an entire meeting, replete with specific clothing descriptions and specific details of conversations is another matter altogether. To describe in detail the clothes being worn by a person who was not even there and to describe in detail conversations that never occurred strikes the Court as being methodical, willful, and intentional.

Furthermore, as the hearing continued, and despite the increasingly obvious fact this meeting could not have occurred,[13] Mr. Bell nonetheless persisted in arguing that while he didn't know if the meeting occurred before or after Mr. Cofer went to jail, (to the point of even surmising the DEA may have brought Mr. Cofer to his office) [Trans., p. 79], he stated emphatically "but he was in my office." [Trans., p. 79] Again, in a further attempt to bolster his argument and his credibility and in an obvious attempt to again convince the Court of the accuracy of his memory and the merits of his contention, Mr. Bell again engaged in very specific descriptions of Mr. Cofer on that day. He confirmed "but he was in my office. He was wearing brand new tennis shoes. He was wearing

_____

[13]The Court notes that in his brief at footnote 2 [3:08-MC-4, Doc. 6], Mr. Bell points out that the false but alleged encounter was an "easily refutable fact," and that Mr. Cofer's continued incarceration would have been known to the Court, who detained him and the AUSA (Jennings) who prosecuted him. However, it is not the Court's nor AUSA Jennings' knowledge that is in issue. It is Mr. Bell's representations regarding the alleged encounter. Further, the fact of Mr. Cofer's continued incarceration was called to Mr. Bell's attention, but despite this, Mr. Bell persisted in refuting it, denying that such fact was true, and offering his version as the truth.

creased blue jeans. He was wearing his leather brown belt. <u>And I remember it</u>." [Trans., p 79 (emphasis added)]

Despite Mr. Bell's current contention that it should be "obvious that Bell did not methodically and intentionally construct a fabricated meeting", it is hard for the Court to envision a more methodical and intentional construction of a fabricated meeting that never occurred, than that given by Mr. Bell on page 79 of the transcript. The methodical nature of the fabrication is clear, not only from the description of the type clothes he had on but the specific description of the clothes. Mr. Bell's argument was not that Mr. Cofer was just wearing a shirt, but a "plaid" shirt, not just shoes but "new" tennis shoes, not just blue jeans but "creased" blue jeans, and not just a belt, but a "leather brown" belt. The effort put into such detailed descriptions of an event that never occurred can hardly be characterized as anything but methodical, willful, and intentional.

Furthermore, as noted in the quote above and as a further attempt at bolstering the accuracy of this memory and his account of the alleged meeting, Mr. Bell emphatically stated "And I remember it." Thus, just one month before claiming the basis for his mistake was a faulty memory, Mr. Bell was asking the Court to sanction another attorney for misconduct and dismiss serious criminal charges by insisting that the basis for his specific description of Mr. Joe Cofer and their alleged meeting, was his <u>good</u> memory.

Later in the proceeding, the Court tried to explain to Mr. Bell it's problem reconciling his assertions, in light of Mr. Cofer's arrest, detention, and continued incarceration, Mr. Bell interrupted the Court to again emphasize that AUSA Jennings "just said that he was in jail and wasn't there. <u>And that's not true</u>." [Trans., p. 79 (emphasis added)] At this juncture, Mr. Bell not only continued to assert the merits of the fabricated meeting, but essentially contended it was AUSA Jennings who

was lying. Again. Mr. Bell did not say anything to indicate or imply there was any potential problem with his memory, or that he simply "believed" Mr. Cofer was there. Rather, to the contrary, he stated as a fact, that Mr. Cofer was present and that it was Mr. Jennings who had just told the Court an untruth. Keeping in mind that the context in which this argument was being made was with regard to a claim by Mr. Bell that AUSA Jennings had engaged in "prosecutorial misconduct", this last statement was a serious, significant, and material allegation. The intent of this statement was to further bolster the merits of his motion to dismiss the indictment and his claim of misconduct on the part of the prosecutor, and additionally put AUSA Jennings' career and reputation in some jeopardy, making the intentional and willful nature of the fabrication and the materiality of the allegations clear.

Furthermore, despite the undersigned's further attempts to point out to Mr. Bell, that what he was averring was not only unlikely, if not impossible [see Trans., pp. 80-82], Mr. Bell never drew any quarter nor did he concede he might have a possible memory issue,. Rather Mr. Bell persisted in putting forth and arguing scenarios as to how this meeting could have occurred, including his conclusion that the DEA could have nefariously pulled him out of jail and "sent him up to my office with a wire," [Trans., p. 80] All the while he persisted with the misrepresentation that he had met with Mr. Cofer in his office. [Trans., pp. 82-83]

The intentional aspect of the misrepresentations was manifested by his continuing to pursue a motion he knew was based on misrepresentations of fact, by his continuing to maintain and assert the misrepresentation over time, by the fabrication of specific details to support an event that never occurred, and by the repeated and embellished nature of the representations and repeated assurance of his memory and his truthfulness. Furthermore, this was done despite the increasing implausibility

of these facts being called to his attention and despite the repeated opportunities to correct the same in light of the actual facts.

Based on the foregoing, the Court finds beyond a reasonable doubt that Mr. Bell intentionally, willfully, and knowingly made the misrepresentations noted above regarding his alleged meeting with Mr. Cofer, an as such, and in pursuing his motion to dismiss for prosecutorial misconduct, this intent amounts to "intent to obstruct" both the administration of justice and the business of the Court. The Court further specifically finds that these misrepresentations were not honest mistakes based on a flawed memory or mistaken belief.

### Materiality / Obstruction Of The Administration Of Justice

Mr. Bell contends that his statements were not material and did not materially obstruct the business of the Court. The materiality of Mr. Bell's misrepresentation appears obvious to the Court, because it constituted the material basis to support his Motion to Dismiss for Prosecutorial Misconduct. Mr. Bell's motion sought to have the charges against Defendant Martin dismissed entirely on the basis that AUSA Jennings had engaged in "prosecutorial misconduct," by virtue of his knowledge of the alleged meeting between Mr. Bell and Mr. Cofer, the alleged creation of a confidential attorney-client relationship, and of AUSA Jennings' knowledge that Mr. Bell would call Mr. Cofer as a witness. Yet the allegations which Mr. Bell relied upon to support the motion were all based on his own misrepresentations and fabricated facts.

Materiality is not determined by whether the untruthful statement actually affected the Court's decision, but whether they could have done so. United States v. Keefer, 799 F.2d 1115, 1126 (6th Cir. 1986) (holding that the test for materiality is whether the "false statement" had a

natural tendency to influence or was capable of influencing the decision); <u>United States v. Chandler</u>, 752 F.2d 1148, 1151 (6th Cir. 1985) (observing that the statement need not in fact influence the decision). Mr. Bell argued in his pleadings and at the hearing on the motion to dismiss, that based on the alleged "facts" he propounded, the Court should have granted the defendant's motion to dismiss the indictment. The motion and the misrepresented facts were designed to and capable of influencing the Court. Had the Court accepted Mr. Bell's statements as true, and not ultimately determined the allegations were factually unsupported misrepresentations, they had a natural tendency to influence the decision of the Court and the potential existed that the Court might have been influenced to grant the motion.

Additionally, these misrepresentations upon which the motions were based, and the efforts taken to eventually establish them as such, required a substantial expenditure of the Court's business, its time and resources. This conduct has obstructed the administration of justice as well as business of the Court, by requiring it and the prosecution to review numerous pleadings and documents, to prepare for, conduct and participate in numerous hearings on the underlying facts and expend substantial time and effort on a matter that never should have been raised - all within weeks of trial. Thus, the Court finds that the false statements were material and materially obstructed both the administration of justice and the business of the Court.

### CONCLUSION

The Court finds that Mr. Bell is guilty of criminal contempt beyond a reasonable doubt. The Court finds beyond a reasonable doubt that Mr. Bell's conduct constitutes misbehavior, the misbehavior amounted to an obstruction of the administration of justice, the conduct took place in

the presence of the Court, and Mr. Bell's conduct was done and misrepresentations made with the intent to obstruct the business of the Court and the administration of justice.

His actions constitute a serious wrong, albeit one that went against Mr. Bell's prior reputation, history and nature. Nonetheless, justice and the administration of justice requires some sanction for this wrong. At the same time, his past history and a heretofore strong reputation as a zealous criminal defense attorney, beckons for mercy. The Court is called upon to strike a fair and reasonable balance. One that metes out justice, including a penalty that is sufficient to properly punish such conduct and to deter such future conduct by Mr. Bell or others, and yet dispenses that justice with a consideration of fairness tailored to fit the particular wrong and the particular wrongdoer. One that teaches Mr. Bell and other attorneys that honesty, candor, integrity in courts of law, and one's reputation for the same, are more than just admirable qualities, but minimum absolute values. Judges must know that they can trust attorneys to be unwavering in their duty and devotion to honesty and integrity. Attorneys must understand that they can still be zealous advocates and play by the rules, act as officers of the Court, and at the end of the day, be secure in knowing that their word is their bond. All who come into the courts, whether attorneys, litigants or witnesses, must know that honesty is imperative and that there is a cost and price to be paid for those who choose to act otherwise.

The Court is mindful that in some sense, Mr. Bell may have in essence caused part of his own punishment. By virtue of this occurrence, and its publicity in the bar and in the public, some may no longer accept him at his word or may now question his integrity and reliability. The Court is also mindful that while Mr. Bell enjoys a reputation as a zealous advocate, this occurrence appears to be a one time blemish on an otherwise lengthy and commendable record of legal representation.

31

Nonetheless, based on the facts set out herein, the Court finds the methodical and intentional misrepresentations in this case to be serious and egregious enough to warrant punishment. Accordingly, the Court must attempt to fashion the most just punishment that fits the crime.

The maximum penalty for this behavior is up to thirty days in jail and a $5,000.00 fine. The Court has seriously considered the appropriateness of some period of incarceration. The Court also seriously considered a jail sentence to be suspended pending a lengthy period of probationary good conduct designed to ensure no further acts of misconduct would occur. However, because of the nature of the delay, Mr. Bell has essentially been in such a probationary period for over a year. Although the pendency of this ruling has, to some degree, been the proverbial sword of Damocles hanging over the head of Mr. Bell, the Court has not been made aware of any further misconduct by Mr. Bell during the time this matter has been under consideration. Accordingly, the results have been the same as if the Court had imposed an immediate suspended sentence and/or imposed a period of probation, and it appears to have had its intended effect. Accordingly, no jail sentence need be imposed.

The Court also considered a period of probation. However, in light of the magnitude of this event, it is likely that Mr. Bell will have to labor long to restore his own credibility and integrity. Mr. Bell has, in effect, already placed himself in a probationary status with those attorneys and courts with whom he must deal daily. Thus, a formal period of probation is not necessary. The pragmatic probationary period he has already faced, and will continue to face, will exceed the length of any probationary period the Court would have decreed. However, self punishment alone is not sufficient in this case. The Court finds that the maximum fine of $5,000.00 is appropriate in this

case as both a just punishment and adequate deterrent against future misconduct. Said fine is due

and payable to the clerk of court within thirty days of the entry of this order.

**IT IS SO ORDERED.**

**ENTER:**

   s/ C. Clifford Shirley, Jr.   
United States Magistrate Judge